[15 NYS3d 36]

THREE AMIGOS SJL REST., INC., Doing Business as THE CHEETAH CLUB, Plaintiff, and TIMES SQUARE RESTAURANT NO. 1., INC., et al., Appellants, v CBS NEWS INC. et al., Respondents.

First Department, August 4, 2015

## APPEARANCES OF COUNSEL

*Law Offices of Nichelle A. Johnson, PLLC,* New Rochelle (*Nichelle A. Johnson* and *Vivian Lee* of counsel), for appellants.

*Levine Sullivan Koch & Schulz, LLP,* New York City (*Jay Ward Brown* and *Chad R. Bowman* of the District of Columbia and Maryland bars, admitted pro hac vice), and *CBS Law Department,* New York City (*Anthony M. Bongiorno* and *Joseph F. Richburg* of counsel) for respondents.

## OPINION OF THE COURT

Tom, J.P.

This defamation action arises out of a wholly accurate news report stating that federal authorities raided The Cheetah Club (Cheetah's), a midtown Manhattan strip club, which they alleged to be "run by the [M]afia" and at the center of an underground immigration ring that brought Russian and eastern European women into the United States, forcing them to work as exotic dancers.

On November 30, 2011, federal agencies charged seven alleged members and associates of the Gambino and Bonanno crime families with, inter alia, transporting and harboring illegal aliens to work as dancers in New York area strip clubs. The indictment alleged that organized crime defendants controlled certain strip clubs and forced women who had been trafficked from eastern Europe to dance at the clubs. As the women would be placed in sham marriages for citizenship purposes, the federal operation was called "Operation Dancing Brides."

On November 30, 2011, federal authorities executed a search warrant at Cheetah's. In support of the warrant's application, a federal officer averred that organized crime conspirators had negotiated terms with strip clubs, including Cheetah's, for trafficked dancers to perform because, in Cheetah's case, other providers had not been able to meet the club's needs. According

to the affidavit, the trafficked women were brought to Cheetah's, where they were video recorded reading contracts and where the women thereafter danced. Plaintiffs take the position that no one at Cheetah's was involved in the crimes underlying Operation Dancing Brides.

The relationship of the Times Square plaintiffs and their employees, the individual plaintiffs, to Cheetah's is not explained, but there is no allegation that these entities are anything more than independent contractors. According to the complaint, plaintiff Times Square Restaurant No. 1, Inc. (No. 1) provides management and promotional services for the Champagne and VIP lounge areas of Cheetah's. Plaintiff Dominica O'Neill is president of No. 1, and plaintiff Sean Callahan is employed as a manager and consultant whose responsibilities include food and beverages, as well as vendor coordination. Plaintiff Times Square Restaurant Group (the Group) operates a booking agency for the talent (dancers) at Cheetah's, and plaintiff Philip Stein is employed by the Group as a manager. Plaintiff Three Amigos SJL Rest., Inc., doing business as The Cheetah Club, is not a party to this appeal.

After the raid at Cheetah's, defendant CBS News broadcast the event during its noon news broadcast. Reporter Kathryn Brown (in front of Cheetah's) broadcast the following:

> "[S]ources tell CBS-2 News this bust is being dubbed 'Operation Dancing Brides,' and this strip club here, Cheetahs in Midtown, they say is at the center of the operation. Cheetahs advertises exotic women and the . . . federal authorities say it is run by the mafia. They have been here—feds have been here all morning. They conducted an early morning raid and they've been here for hours inside collecting evidence. They are still inside right now. Meantime, earlier this morning, agents with the immigrations and customs enforcement arrested 25 men described as ringleaders of this entire operation. Many of them they say are members of the Gambino and Bonanno crime families. They say the men were involved in an elaborate operation to recruit women from Russia and eastern Europe into the U.S. . . . [to] force the women to work as dancers in strip clubs across New York City, including Cheetahs . . . This is still a developing story and we will have much more on this tonight on CBS-2 News at 5:00."

At 5:00 p.m., defendants broadcast a news program called The Evening Report, which contained, inter alia, the following segment:

> "Federal authorities carried out boxes of evidence from this Midtown strip club during an early morning raid. They say the club, Cheetahs, is one of several at the center of an underground immigration ring that stretches from Times Square to the heart of Russia. Investigators say Russian and Italian mobsters were working together in the elaborate scheme to bring Russian and eastern European women to the U.S., then funnel them to strip clubs to work as exotic dancers."

The Evening Report then showed Kathryn Brown interviewing a federal law enforcement official, the director of the National Organization for Women, and David Carlebach, an attorney for Cheetah's. Carlebach was broadcast saying, "There is absolutely no La Cosa Nostra, as you say, connection."

At 9:25 p.m., the local CBS New York website posted a summary of the story, embedding a PDF copy of the indictment. The website included the statements that Cheetah's had been "raided," and that Cheetah's was "one of several [strip clubs] at the center of an underground immigration ring" controlled by indicted defendants who "protected their turf through intimidation and threats of physical and economic harm." The story ended, "As federal teams cast a wide net around strip clubs and their owners[,] attorney David Carlebach . . . insisted his client's hands are clean. 'There is absolutely no "La Cosa Nostra," as you say, connection,' Carlebach said."

By summons and verified complaint filed April 27, 2012, plaintiffs alleged that defendants, in broadcasting and publishing stories concerning Operation Dancing Brides, defamed them. Plaintiffs claimed that the stories were misleading, false, and malicious, and that plaintiffs had no connection with the Mafia, Operation Dancing Brides, human trafficking, extortion, or any other human rights abuse. The complaint contains four causes of action—defamation per quod, defamation per se, injurious falsehood, and respondeat superior. Plaintiffs assert that the false allegations of Cheetah's involvement subjected plaintiffs to scorn and ridicule and adversely affected their ability to earn income from their activities on behalf of the club.

Defendants moved pursuant to CPLR 3211 (a) (1) and (7) for dismissal of the complaint. Defendants argued, inter alia, that

all claims made by the Times Square plaintiffs and by the individual plaintiffs (collectively plaintiffs) must be dismissed because the challenged news reports were not "of and concerning" plaintiffs, as a matter of law.

Plaintiffs opposed defendants' motion, arguing that the alleged libel designated plaintiffs in such a way so as to let those who knew them understand that they were the persons meant and that plaintiffs were entitled to so prove that fact to a jury. Specifically, plaintiffs pointed to the reports' assertions that Cheetah's was "run by the mafia" and "at the center" of a human trafficking ring. By making such statements, plaintiffs argued, defendants were asserting that O'Neill, Stein, and Callahan were members of organized crime.

The motion court granted defendants' motion, found that all of the challenged statements related solely to Cheetah's, and dismissed the claims of the Times Square plaintiffs and the individual plaintiffs. The court further found that nothing in any of the broadcasts mentioned, or even indirectly referred to, the Times Square corporations, nor did any statement assert or even imply that the individually named plaintiffs were part of the Mafia or a global trafficking scheme. That the broadcast might have a negative impact on the business of the Times Square corporations, or that they might have caused plaintiffs' friends to shun them did not demonstrate that the statements were "of and concerning" plaintiffs. The court also noted that First Amendment concerns required plaintiffs to be clearly identifiable, which they were not.

On appeal, plaintiffs cling to their contention that they are clearly identifiable as the persons and entities that "run" Cheetah's on account of the functions they perform for the club. At the outset, plaintiffs do not explain why entities that merely supply services to an establishment should be perceived by the public to exercise such control over its operation as to be identified with illegal activities on the premises. To the contrary, plaintiffs' relationship to Cheetah's is peripheral, and the public at large would have no reason to think that they were implicated in the federal investigation. As to patrons, there is no explanation of why they would be aware of the businesses that supply food and beverages to the club (Times Square Restaurant No. 1) or book dancers to perform there (Times Square Restaurant Group). While the individual plaintiffs involved in the operation of those businesses may be present at the club "on a daily basis . . . and are highly visible to . . .

customers," as the affidavit of Dominica O'Neill states, they are nevertheless mere employees. Significantly, they are not employees of Cheetah's itself, but rather, present at the club to perform the services provided to it by their own employers. They can hardly be understood to be "those who 'run' the Cheetah Club," which implies persons in a position of ownership or control, not vendors that supply management services or their employees, whose presence is required in order to render those services.

As noted, Cheetah's is not a party to this appeal. The club's owner, nonparty Selim Zherka, is currently being held without bail, awaiting trial on an indictment charging him with fraud, income tax fraud and witness tampering (*United States v Zherka*, 592 Fed Appx 35 [2d Cir 2015]). Zherka has filed numerous civil rights actions against government officials who he claims described him as a "mobster." The lawsuits assert that allegations of his organized crime connections are false and are either motivated by prejudice against his Albanian ethnicity or retaliation for his ownership of strip clubs. Each case has either been dismissed prior to adjudication or voluntarily withdrawn by Zherka. Zherka, as the owner of Cheetah's, is in a position of ownership and control, not plaintiffs. The Times Square plaintiffs are not identified in the news reports as being operated by organized crime, and their capacity as vendors to Cheetah's hardly serves to equate them with those identified by the report as "the [M]afia."

The affidavits supporting the warrant to search Cheetah's remain under seal in connection with federal indictments arising out of information obtained from its execution. Thus, the asserted falsity of the news reports cannot be assessed. However, even assuming the reports to be untrue, plaintiffs do not establish that the accurate reporting of events surrounding the search, including the purportedly untrue statements attributed to federal authorities, is outside the protection of the First Amendment. Even upon a cursory analysis, it is impossible to escape the conclusion that exposing news organizations to defamation claims by any business supplying goods or services to an entity reported to be engaged in illegal conduct would have a chilling effect on free speech, specifically, the dissemination of information of general interest to the public. Even where a news report is inaccurate, a defamation action is subject to summary dismissal if "the story covered a topic within the sphere of legitimate public concern" (*Carlucci v*

*Poughkeepsie Newspapers*, 88 AD2d 608, 609 [2d Dept 1982], *affd* 57 NY2d 883 [1982]).

As the dissent acknowledges, whether a particular publication is capable of the meaning ascribed to it is a question for the court (*Julian v American Bus. Consultants*, 2 NY2d 1, 14 [1956]). Similarly, whether a plaintiff in a defamation action has demonstrated that a particular statement names or so identifies him so that the statement can be said to be "of and concerning" that plaintiff may be decided as a matter of law and need not be determined by a jury (*see Springer v Viking Press*, 60 NY2d 916, 917 [1983]). Where, as here, the statement does not name the plaintiffs at all and contains nothing that would cause a reader to think defendant was referring to them, the statement is not "of and concerning" the plaintiffs (*Smith v Catsimatidis*, 95 AD3d 737 [1st Dept 2012], *lv denied* 20 NY3d 852 [2012]; *see Salvatore v Kumar*, 45 AD3d 560, 563 [2d Dept 2007], *lv denied* 10 NY3d 703 [2008] [complaint dismissed where plaintiff was not named and statement in defendant's publication about some of its "executives and personnel" was not sufficiently "of and concerning" plaintiffs, former employees of defendant]). As this Court has noted, a statement made about an organization is not understood to refer to any of its individual members unless that person is distinguished from other members of the group (*Fulani v New York Times Co.*, 260 AD2d 215, 216 [1st Dept 1999]). Likewise, where an allegedly defamatory statement is directed at a company, it does not implicate the company's suppliers, partners, vendors or affiliated enterprises even if they sustain injury as a result (*see Kirch v Liberty Media Corp.*, 449 F3d 388, 398 [2d Cir 2006]).

The dissent accepts, as a matter of law and fact, that the individual plaintiffs (though not the Times Square plaintiffs) "run" Cheetah's, as the complaint alleges. While this contention is superficially plausible, it does not withstand closer inspection. The argument is specious, founded upon an attempt to conflate the meaning of the terms "manage" and "run." The fundamental flaw in the complaint is the failure to distinguish the concept of *control* over an organization from the mere provision of management services to the entity by a vendor or, more specifically, the employees of a vendor. The general understanding of a business "run by the [M]afia" is the subjugation of the entity by organized crime, typically by force and intimidation, in furtherance of illegal activities. Ultimately, the theory of recovery espoused in the complaint amounts to

an exercise in semantics. While "run" may colloquially refer to management of the routine, day-to-day operation of a business, its meaning acquires a significantly more sinister connotation when used in the same sentence as "[M]afia." The public certainly appreciates this distinction, even if the dissent does not appear to grasp its import. Significantly, the dissent does not contend that the individual plaintiffs were in a position to exercise such authority over Cheetah's operation that they can be said to have been in control of its affairs (conceding that their employers, the Times Square plaintiffs, do not occupy such a position of dominance). Were the individual plaintiffs to attempt to meddle in the affairs of an entity truly "run" by organized crime, they would need to adopt yet a third, considerably more dynamic definition of the term.

A plaintiff bears the burden of pleading and proving that the asserted defamatory statement "designates the plaintiff in such a way as to let those who knew him understand that he was the person meant" (*Stern v News Corp.*, 2010 WL 5158635, *5, 2010 US Dist LEXIS 133119, *16 [SD NY, Oct. 14, 2010, No. 08-Civ-7624 (DAB/RLE)], citing *Fetler v Houghton Mifflin Co.*, 364 F2d 650, 651 [2d Cir 1966]). While a plaintiff may use extrinsic facts to prove that the statement is "of and concerning" him, he must show the reasonableness of concluding that the extrinsic facts were known to those to whom the statement was made (*see Chicherchia v Cleary*, 207 AD2d 855, 856 [2d Dept 1994]; *see also Geisler v Petrocelli*, 616 F2d 636, 639 [2d Cir 1980] [noting that the burden " 'is not a light one' "]). Plaintiffs seek to state their case by innuendo. As this Court stated:

> " 'The question which an innuendo raises, is [one] of logic. It is, simply, whether the explanation given is a legitimate conclusion from the premise stated.'
>
> "The innuendo, therefore, may not enlarge upon the meaning of words so as to convey a meaning that is not expressed" (*Cole Fisher Rogow, Inc. v Carl Ally, Inc.*, 29 AD2d 423, 427 [1st Dept 1968] [alteration in original], *affd* 25 NY2d 943 [1969], quoting *Tracy v Newsday, Inc.*, 5 NY2d 134, 136 [1959]).

The suggestion that the individual plaintiffs are necessarily identified as members of organized crime because they are employees of entities that provide management services to

Cheetah's—reported to be "run" by the Mafia—is simply not logical. It is based on innuendo and constitutes an attempt to enlarge the concept of managerial services to include domination and control of an organization by force, whether actual or threatened, in contravention of the rule set forth in *Tracy*.

Accordingly, the order of Supreme Court, New York County (Ellen M. Coin, J.), entered on or about April 18, 2013, which to the extent appealed from as limited by the briefs, granted defendants' motion for dismissal of the defamation claims asserted by plaintiffs Times Square Restaurant No. 1, Inc., Times Square Restaurant Group, Dominica O'Neill, Shawn Callahan, and Philip Stein pursuant to CPLR 3211 (a) (1) and (7), should be affirmed, without costs.

KAPNICK, J. (dissenting in part). I respectfully dissent in part from the majority's opinion and find that the motion court's decision should be modified to the extent of denying the motion to dismiss as to Dominica O'Neill, Shawn Callahan and Philip Stein's claims arising out of the alleged defamatory statement "it is run by the mafia," but otherwise agree that the remainder of the alleged defamatory statements are not actionable and that the Times Square plaintiffs were properly dismissed.

It is axiomatic that "to prevail in defamation litigation, a plaintiff must establish that it was he or she who was libeled or slandered: that the allegedly defamatory communication was about ('of and concerning') him or her" (1 Robert D. Sack, Sack on Defamation § 2:9 at 2-147 [4th ed 2012] [footnotes omitted]; *Julian v American Bus. Consultants*, 2 NY2d 1, 17 [1956]). It is also well settled that

> "[i]t is unnecessary for an article [or statement] to name a person in order for it to be 'of and concerning' that person. If it can be shown either that the implication of the article was that the plaintiff was the person meant or that he or she was understood to be the person spoken about in light of the existence of extrinsic facts not stated in the article, then it is 'of and concerning' the plaintiff as though the plaintiff was specifically named." (1 Robert D. Sack, Sack on Defamation § 2:9.1 at 2-149 [4th ed 2012], citing *DeBlasio v North Shore Univ. Hosp.*, 213 AD2d 584 [2d Dept 1995].)

Further, "[i]t is not necessary that all the world should understand the libel; it is sufficient if those who knew the

plaintiff can make out that he is the person meant" (*Stern v News Corp.*, 2010 WL 5158635, \*5, 2010 US Dist LEXIS 133119, \*16 [SD NY, Oct. 14, 2010, No. 08-Civ-7624 (DAB/ RLE)] [internal quotation marks omitted] [applying New York law]; *see also* NY PJI 3:25, Comment).

Plaintiffs urge that dismissal of their defamation claims at the pleading stage was premature because their claims were adequately pleaded and they were improperly foreclosed from adducing further proof to establish the "of and concerning" prong.

Defendants, on the other hand, argue that dismissal was warranted because the "of and concerning" determination presents a threshold question of law for the court based upon the specific content of the allegedly actionable publication. The defendants' view is that a "plaintiff who is not named in an allegedly defamatory statement, 'must sustain the burden of pleading and proving that the defamatory statement referred to him or her'" (quoting *Chicherchia v Cleary*, 207 AD2d 855, 855-856 [2d Dept 1994], citing Prosser & Keeton, Torts § 111 at 783 [5th ed 1984]) and that plaintiffs here failed to sustain their burden.

Relying primarily on *Chicherchia* and *Julian*, the motion court stated the following as authority for granting the motion to dismiss:

> "The plaintiff's burden on this element is not a light one. The defamatory matter and the plaintiff must be linked together by a chain of unchallenged proof for the plaintiff to reach the jury on the element 'of and concerning.' While reference to the allegedly defamed party may be indirect and may be shown by extrinsic facts, if the plaintiff uses such extrinsic facts, he or she must show that it is reasonable to conclude that the publication refers to the plaintiff, and those facts were known to those who read or heard the publication. Plaintiff cannot use innuendo to enlarge, rather than explain, in an effort to have him or herself identified in the public mind as the target of the alleged defamation" (2013 NY Slip Op 31081[U], \*9 [Sup Ct, NY County 2013] [citations omitted]).

While there can be no dispute that a defamation plaintiff ultimately has the heavy burden of proving the "of and concerning" prong, the question raised by this appeal is what burden

does the plaintiff, who is not named directly and must rely on extrinsic evidence, have at the *pleading stage* to overcome a motion to dismiss based on the assertion that the statements were not "of and concerning" plaintiff.

As initially observed by the motion court, "Generally, whether the complaint sufficiently alleges facts to demonstrate a connection between the particular plaintiff and the alleged libel is an issue for the court" (2013 NY Slip Op 31081[U], *8). As Judge Sack explains it, "Whether the complaint alleges facts sufficient reasonably to connect the libel to the plaintiff is a question for the court, although the ultimate determination of whether the libel actually applies to the plaintiff is for the jury" (1 Robert D. Sack, Sack on Defamation § 2:9.3 at 2-155 [4th ed 2012]).[1]

"When a defamation concerns a group of people, and one or more members of that group bring a libel or slander action, thorny questions are presented as to whether the communication is 'of and concerning' the plaintiff or plaintiffs" (1 Robert D. Sack, Sack on Defamation § 2:9.4 at 2-155 [4th ed 2012]). "Under some circumstances, courts have permitted an unnamed member of a group to maintain a claim for defamation where a defamatory statement has been made against the group" (*Algarin v Town of Wallkill*, 421 F3d 137, 139 [2d Cir 2005]).

Courts look to a number of factors to determine the sufficiency of group defamation allegations. First, "the size of a group is critical to the sufficiency of a claim by an unnamed member of a group" (*Algarin*, 421 F3d at 139, comparing *Neiman-Marcus v Lait*, 13 FRD 311, 313, 316 [SD NY 1952] [claim by members of a group of 25 sufficient], with *Abramson v Pataki*, 278 F3d 93, 102 [2d Cir 2002] [claim by members of a group of more than 1,000 insufficient], citing Restatement

---

1. CPLR 3016 (a) makes it clear that a heightened pleading standard does not apply to "of and concerning" allegations, since it mandates that "[i]n an action for libel or slander, the particular words complained of shall be set forth in the complaint, *but their application to the plaintiff may be stated generally*" (emphasis added; *see also* NY PJI 3:25, Comment ["Note that although the reference to the plaintiff may be pleaded generally, the particular words complained of must be pleaded specifically"]). It is interesting to note that in some states it is necessary to plead the extrinsic facts that identified plaintiff to the reader as the defamed party (1 Robert D. Sack, Sack on Defamation § 2:9.1 at 2-151 [4th ed 2012], citing *Velle Transcendental Research Assn. v Esquire, Inc.*, 41 Ill App 3d 799, 803, 354 NE2d 622, 626 [1976] [comparing California procedure, where, by statute, "there is no requirement that plaintiffs plead extrinsic facts to show that the defamatory words apply to the plaintiff," and Illinois procedure, where there is such a requirement]).

[Second] of Torts § 564A, Comment *b* ["It is not possible to set definite limits as to the size of the group or class, but the cases in which recovery has been allowed usually have involved numbers of 25 or fewer"]). In *Brady v Ottaway Newspapers* (84 AD2d 226 [2d Dept 1981]), the Appellate Division, Second Department, rejected a definitive size limitation and allowed libel claims to proceed for a group of at least 53 police officers out of a department of more than 70 (*id.* at 228 n 1, 234).[2] Relying in part on the Court of Appeals' language in *Gross v Cantor* (270 NY 93 [1936]),[3] *Brady* adopted the "intensity of suspicion test":

> "With the intensity of suspicion test, size is a consideration and the probability of recovery diminishes with increasing size.[4] Size[,] however, is not the only factor evaluated. It is balanced against the definiteness in number and composition of the group and its degree of organization. This list of balancing factors or reference elements

---

**2.** The First Amendment dictates courts' long-standing disfavor of group defamation claims. In *Brady*, the Court explained that "the larger the collectivity named in the libel, the less likely it is that a reader would understand it to refer to a particular individual" (84 AD2d at 228). As a result, the Court reasoned that

> "individual harm cannot occur as the result of a group-libelous statement, because the hearer of the statement will make the rational assessment that such a statement is, by its nature, less likely to be true with respect to every member of a large group than it is to be true with respect to a particular individual" (*id.* at 229).

This reasoning serves to "encourage frank discussions of matters of public concern under the First Amendment guarantees" (*id.*).

**3.** In *Gross*, the Court of Appeals held as follows:

> "[A]n impersonal reproach of an indeterminate class is not actionable. But if the words may by any reasonable application, import a charge against several individuals, under some general description or general name, the plaintiff has the right to go on to trial, and it is for the jury to decide, whether the charge has the personal application averred by the plaintiff" (270 NY at 96 [internal quotation marks and citation omitted]).

**4.** Despite the court's rejection of a group size limitation, it is clear that membership in a small group increases a plaintiff's chance of recovery:

> "[A]n individual belonging to a small group may maintain an action for individual injury resulting from a defamatory comment about the group, by showing that he is a member of the group. Because the group is small and includes few individuals, reference to the individual plaintiff reasonably follows from the statement and the question of reference is left for the jury" (*Brady*, 84 AD2d at 231 [footnote and citation omitted]).

is not meant to be exclusive" (*id.* at 236 [citation omitted]).

The Court went on to note that "the prominence of the group and the prominence of the individual within the group" are other proper "reference elements" (*id.*).

In addition to these factors, courts also consider "whether the defamatory statement refers to 'all' or only 'some' members of the group" (*Algarin*, 421 F3d at 140). In *Brady*, for example, the statement at issue referred to *all* members of a relatively small, identifiable group (the 53 unindicted police officers of the City of Newburgh in 1972) (*Brady*, 84 AD2d at 228, 237), as opposed to a statement that only refers to "some" members of a group, making it less likely for an individual plaintiff to be linked to the statement (*see e.g. Owens v Clark*, 154 Okla 108, 6 P2d 755 [1931]; *see also* 1 Robert D. Sack, Sack on Defamation § 2:9.4 at 2-156 [4th ed 2012] ["An attack on some is less likely to associate a particular member of the group with the allegations than an attack on all the members of the same group—to say some members of a law firm are incompetent is less likely to injure the reputation of a particular partner than would the allegation that each and every partner was incompetent"]).[5]

Here, there are sufficient facts pleaded at this early stage in the litigation to reasonably connect the individual plaintiffs with the following statement: "it [meaning Cheetah's] is run by the mafia." O'Neill provided an affidavit in which she alleged extrinsic facts that she, Callahan, and Stein were part of a "small and exclusive group of individuals" who ran and managed Cheetah's, with constant visible contact with customers, officials, dancers, and vendors. Taking these allegations as true, as we must on a motion to dismiss (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994]), the individual plaintiffs are members of a small, identifiable group that allegedly "ran" Cheetah's and are thus implicated in the allegedly defamatory statement. We note that the result might be different had the statement only implicated *some* of those running Cheetah's. While we do not know the exact size, organization, composition or prominence of the alleged defamation group at this stage in the litigation, there are enough facts alleged at this time to demonstrate the requisite connection.

---

**5.** The "all" versus "some" distinction is not absolute. In *Neiman-Marcus v Lait* (13 FRD 311 [SD NY 1952]), the court found that the salesmen plaintiffs did have a cause of action, despite the use of the word "most" instead of "all" (*id.* at 316).

Whether or not the individual plaintiffs can come forward with evidence to support these allegations and ultimately prove that they were each individually understood to be referred to in light of extrinsic facts not stated in the broadcast, is not to be decided on a pre-answer motion to dismiss.

Moreover, in reaching its result, the majority usurps the role of the trier of fact by outright deciding the meaning or the "general understanding" of the phrase "run by the mafia." The majority goes on to assert its understanding of the "colloquial[ ]" meaning of the phrase "to run a business" and states that the public can appreciate the "sinister connotation" of a reference to the "Mafia." Not only are these clearly questions for a jury, it is unclear why these questions are relevant to the inquiry of whether the statement is "of and concerning" the individual plaintiffs. The majority's parsing of whether "run" means to have control over an organization or whether it means to merely provide management services is misplaced. The majority argues that "run" must mean having ownership or control of the business and that because the individual plaintiffs do not allege that they have such ownership or control over Cheetah's, their claim must fail. This argument, which is not set forth by defendants, is unsound. On a motion to dismiss, we must accept the complaint as true, and here it sufficiently alleges that the individual plaintiffs "run" the operations at Cheetah's. No further inquiry into what that means can properly be made on a pre-answer motion to dismiss.

I agree with the majority that the remaining statements are not actionable by the individual plaintiffs as they only refer to "Cheetah's," which is too general a reference to implicate even the individual plaintiffs.

With respect to the Times Square plaintiffs, they have not met their burden of showing that any of the allegedly defamatory statements are "of and concerning" them, as there are no allegations to support a reasonable connection linking these corporate entities to the statements.

FRIEDMAN and DEGRASSE, JJ., concur with TOM, J.P.; KAPNICK, J., dissents in part in a separate opinion in which RICHTER, J., concurs.

Order, Supreme Court, New York County, entered on or about April 18, 2013, affirmed, without costs.