16-2465-cv
*Elias et al. v. Rolling Stone LLC et al.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

AUGUST TERM, 2016

ARGUED: April 27, 2017
AMENDED DECISION: September 22, 2017

No. 16-2465-cv

_____

GEORGE ELIAS, IV, STEPHEN HADFORD, ROSS FOWLER,

*Plaintiffs–Appellants*,

v.

ROLLING STONE LLC, SABRINA RUBIN ERDELY, WENNER MEDIA LLC,

*Defendants–Appellees*.

_____

Appeal from the United States District Court
for the Southern District of New York.
No. 15-cv-5953 — P. Kevin Castel, *Judge*.

_____

Before: CABRANES and LOHIER, *Circuit Judges*, and FORREST, *District Judge*.[1]

_____

---

[1] Judge Katherine B. Forrest, of the United States District Court for the Southern District of New York, sitting by designation.

Plaintiffs-Appellants George Elias, IV, Stephen Hadford, and Ross Fowler appeal from a decision of the United States District Court for the Southern District of New York (Castel, *J.*) dismissing their defamation claims against Defendants-Appellees Rolling Stone, LLC, Sabrina Rubin Erdely, and Wenner Media LLC. Plaintiffs' defamation action arises from a now-retracted *Rolling Stone* magazine article written by Erdely titled, "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA" (the "Article") as well as a subsequent online podcast appearance by Erdely discussing the Article (the "Podcast"). The District Court granted Defendants' motion to dismiss for failure to state a claim in its entirety. The District Court held that Plaintiffs had not sufficiently pled that Defendants' purportedly defamatory statements in the Article and the Podcast were "of and concerning" them. Additionally, the District Court held that Erdely's Podcast statements were non-actionable opinion. We hold that Plaintiffs Elias and Fowler have plausibly alleged that the purportedly defamatory statements in the Article only were "of and concerning" them individually. We also hold that Plaintiffs have plausibly alleged that the Article was "of and concerning" them under a theory of small group defamation. However, we hold that the District Court correctly determined that Erdely's

comments in the Podcast were non-actionable opinion, and that Plaintiff Hadford did not plausibly allege that the statements in the Article were "of and concerning" him as an individual apart from his membership in Phi Kappa Psi. Accordingly, we AFFIRM in part insofar as the District Court dismissed Plaintiffs' claims regarding the Podcast and Plaintiff Hadford's individual claims, and REVERSE in part insofar as the District Court dismissed Plaintiffs Elias's and Fowler's individual claims and all Plaintiffs' claims under a theory of small group defamation, and REMAND the cause to the District Court for further proceedings consistent with this opinion.

Judge Lohier filed a separate opinion concurring in part and dissenting in part.

_____

ALAN LEE FRANK, Alan L. Frank Law Associates, P.C., Jenkintown, PA, *for Plaintiffs-Appellants*.

ELIZABETH A. MCNAMARA (Samuel M. Bayard, Abigail B. Everdell, Davis Wright Tremaine LLP, New York, NY; Alison Schary, Davis Wright Tremaine LLP, Washington, DC, *on the brief*), Davis Wright Tremaine LLP, New York, NY, *for Defendants-Appellees*.

_____

FORREST, *District Judge*:

George Elias, IV, Stephen Hadford, and Ross Fowler (collectively, "Plaintiffs") appeal from a June 28, 2016 decision of the United States District Court for the Southern District of New York (Castel, *J.*) dismissing their defamation claims against Rolling Stone, LLC ("Rolling Stone"), Sabrina Rubin Erdely, and Wenner Media LLC ("Wenner Media") (collectively, "Defendants"). Plaintiffs' defamation action arises from a now-retracted *Rolling Stone* magazine article written by Erdely titled, "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA" (the "Article") as well as a subsequent online podcast appearance by Erdely discussing the Article (the "Podcast"). The Article, first published in the November 19, 2014 online edition of the magazine, presented a detailed account of an alleged violent gang rape of a woman named "Jackie" by seven male participants and two male onlookers (including a man named "Drew") in a bedroom of the Phi Kappa Psi fraternity house at the University of Virginia ("UVA").

Following widespread national attention to the Article's allegations, it was discovered that "Jackie," the Article's main subject as well as Erdely's principal source, had fabricated the story. In the wake of this discovery, *Rolling Stone* retracted the Article and issued an apology on April 5, 2015.

On July 29, 2015, Plaintiffs sued Rolling Stone, Erdely, and Wenner Media for defamation. Plaintiffs, who were undergraduate students and members of the Phi Kappa Psi fraternity at UVA when Jackie's rape purportedly occurred, alleged that the Article and Podcast defamed them by identifying them individually as participants in Jackie's alleged rape and by identifying them collectively as members of a group of Phi Kappa Psi fraternity brothers at the time the rape allegedly occurred.

Defendants moved to dismiss Plaintiffs' complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). By Memorandum and Order dated June 28, 2016, the District Court granted Defendants' motion in its entirety. The District Court held that Plaintiffs had not sufficiently pled that Defendants' statements were "of and concerning" them, as is necessary to sustain a claim for defamation. The District Court found that, as a matter of law, the statements were insufficient to be "of and concerning" each Plaintiff individually and were also insufficient to support small group defamation. Additionally, the District Court held that Erdely's Podcast statements were not factual assertions, but non-actionable opinion.

On appeal, we conclude that the District Court properly dismissed Plaintiffs' defamation claim arising from the Podcast. We also find that the District Court properly dismissed Plaintiffs' claims relating to Hadford individually. With regard to Elias and Fowler, however, we conclude that the complaint plausibly alleged that the statements in the Article were "of and concerning" them individually. We further conclude that the complaint plausibly alleged that all Plaintiffs were defamed as members of Phi Kappa Psi under a theory of small group defamation. Accordingly, we AFFIRM in part insofar as the District Court dismissed Plaintiffs' claims regarding the Podcast and Plaintiff Hadford's individual claims, and REVERSE in part insofar as the District Court dismissed Plaintiffs Elias's and Fowler's individual claims and all Plaintiffs' claims under a theory of small group defamation, and REMAND the cause to the District Court for further proceedings consistent with this opinion.

## BACKGROUND

**A.    Factual Background**

1.    <u>The Plaintiffs</u>

The following facts are taken from the complaint and joint appendix and are presumed true for the purpose of resolving Defendants' motion to dismiss.

Plaintiffs are George Elias IV, Ross Fowler, and Stephen Hadford, three men in their mid-twenties who graduated from UVA in 2013. All were active members of the Phi Kappa Psi fraternity in the fall of 2012, the relevant timeframe of Jackie's alleged rape described in the Article. As discussed in further detail below, Plaintiffs' relevant individual distinguishing characteristics are as follows: Elias lived in the first bedroom at the top of the stairs on the second floor of Phi Kappa Psi's on-campus fraternity house; Fowler was a previous rush chair for the fraternity and an avid swimmer at the university aquatic facility; and Hadford frequently rode his bike on campus in the year following his graduation. Plaintiffs' membership in the fraternity and the UVA class of 2013 was shown and listed on Plaintiffs' Facebook accounts, Phi Kappa Psi's website, and is common knowledge amongst current and former UVA students. In the fall of 2012, there were fifty-three Phi Kappa Psi members, of whom thirty-one were members of either the class of 2013 or 2014.

Phi Kappa Psi's UVA chapter has an on-campus house in which the fraternity hosts events and where certain fraternity members live. During both the 2012 and 2013 school years, Plaintiff Elias lived in the Phi Kappa Psi house in the first bedroom at the top of the first flight of stairs; according to the complaint,

this was known to people who knew Elias because, among other reasons, it was unusual for Phi Kappa Psi members to live in the on-campus house for more than one year. Elias's room was the only bedroom in the house on the second floor that was not located behind an electronic keypad lock; it was therefore the only bedroom on the second floor that was directly accessible from the house's main staircase. According to the complaint, Elias's room was also one of only three rooms on the second floor of the house large enough to hold ten people.

Like many fraternities, Phi Kappa Psi requires prospective members to apply for membership through a pledge process run by a "rush chair." Fowler served as rush chair for the 2010-2011 academic year, making him responsible for the fraternity's recruitment and initiation processes, and he was also active in the rush process during the 2011-2012 academic year. Fowler was also an avid swimmer at UVA; he regularly swam at the university's aquatic center.

Plaintiff Hadford was also a member of Phi Kappa Psi who graduated in 2013. According to Plaintiffs, Hadford wore Phi Kappa Psi shirts almost daily prior to the release of the Article. Hadford lived on campus for fifteen months after graduating, and he frequently rode his bike across the UVA campus on his way to work or social visits.

2.      The Article and Podcast

On November 19, 2014, *Rolling Stone* published an online article authored by Erdely titled, "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA."  According to the complaint, the Article generated worldwide headlines, and its online edition received more than 2.7 million views.  The main subject of the Article was "Jackie," a woman interviewed by Erdely and who was Erdely's primary source for the piece.  The Article recounts a brutal gang rape that Jackie claimed she suffered over the course of three hours in a bedroom at the Phi Kappa Psi fraternity house at UVA in the fall of 2012.

The Article opened with Jackie, then a freshman, at a party with "her date, [a] handsome Phi Kappa Psi brother" pseudonymously named "Drew," a junior whom she "met while [they were] working lifeguard shifts together at the university pool." JA-100 to JA-101.  According to the Article, Drew then invited Jackie to an upstairs bedroom, where she was subsequently thrown through a glass table and forcibly gang raped by seven men while Drew and a ninth man observed.  The Article stated that "spectators swigged beers" and the attackers "called each other nicknames like Armpit and Blanket." JA-101.  According to the Article, the attackers encouraged one participant to rape Jackie by uttering

statements like "What, she's not hot enough for you?"; "Don't you want to be a brother?"; and "We all had to do it, so you do, too." *Id.* Jackie eventually passed out and awoke with her dress "spattered with blood," at which point she exited the house while the party was still underway. *Id.* The Article explained that Drew later thanked Jackie for a "great time" at the party, and the other purported attackers likewise behaved toward Jackie as if nothing had ever happened. JA-103.

At the end of her freshman year, the Article stated, Jackie first reported the rape to UVA Dean Nicole Eramo. JA-105. Dean Eramo is also reported as stating in late 2014 that "all the boys involved have graduated." JA-108. In addition to Jackie's rape, the Article described a rape that occurred at the Phi Kappa Psi house in 1984,[2] and asserted that after Jackie shared her account with friends, two other female UVA undergraduates contacted her and confided that they, too, had recently been Phi Kappa Psi gang-rape victims.[3]

---

[2] The occurrence of this 1984 rape is not a matter in dispute in this case.

[3] Interspersed with episodes of Jackie's story in the Article is Erdely's presentation of alleged research on the pervasiveness and normalization of sexual assault on university campuses in general and at UVA in particular.

On November 27, 2014, Erdely was interviewed as a guest on a podcast hosted by the online publication *Slate*. During the Podcast, Erdely stated:

> I mean I would think that the first thing that they would do is at least tell her, you know, this needs to go to the police, these are dangerous people who are hurting people—who are hurting people—if they hurt you, and you know, and she heard them saying things during the rape like oh, you know, you have to, you know egging—keep egging each other on saying things like "Don't you wanna be a brother?" which seems to indicate that this is some kind of initiation ritual.
>
> . . .
>
> I would speculate that life inside of a frat house is a—probably—you know, you have this kind of communal life where everybody's sort of sharing information, it's a very—it's a life where, you know, people are living their lives very closely with one another. And, um, it seems impossible to imagine that people didn't know about this, that some people didn't know about this, maybe not everybody—it's a fairly large fraternity—there's something like 82 brothers in the fraternity now, currently in there—But it seems impossible to imagine that people did not know about it.

JA-26.

3.  Retraction

Three weeks after the Article's online publication, on December 5, 2014, the *Washington Post* published an article titled, "Key elements of Rolling Stone's U-Va. gang rape allegations in doubt." JA-27. That same day, *Rolling Stone*'s managing editor issued a public apology on the magazine's website, stating that

"in the face of new information, there now appear to be discrepancies in Jackie's account, and we have come to the conclusion that our trust in her was misplaced." *Id.* It soon came to light that Jackie, Erdely's primary source, had fabricated the account of the gang rape and its aftermath, including the purported failures by the UVA administration to respond appropriately. On April 5, 2015, *Rolling Stone* officially retracted the Article and issued a written apology "to our readers and to all of those who were damaged by our story and the ensuing fallout, including members of the Phi Kappa Psi fraternity and UVA administrators and students." JA-29.

**B.    Procedural History**

Plaintiffs commenced this action on July 29, 2015, claiming defamation for statements made in the online and print editions of the Article and during Erdely's Podcast interview.[4] On June 28, 2016, the District Court granted Defendants' motion to dismiss the complaint in its entirety for failure to state a claim. Principally, the District Court's decision was based on two findings: first, that none of the three Plaintiffs had alleged sufficient facts to show that the allegedly defamatory statements were "of and concerning" them; and second,

---

[4] Plaintiffs voluntarily dismissed count four of their complaint alleging negligent infliction of emotional distress.

that Erdely's Podcast remarks were non-actionable opinion. With regard to its first finding, the District Court determined that, as a matter of law, the statements at issue were insufficient to be "of and concerning" each Plaintiff individually and were also insufficient to support small group defamation.

This appeal followed.

## DISCUSSION

**A.    Standard of Review**

We review the grant of a motion to dismiss under Rule 12(b)(6) *de novo*, "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chase Grp. Alliance LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it

'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal citation omitted).

**B.      Applicable Legal Principles**

The parties agree that New York law applies to this case.  In New York, "[d]efamation is 'the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.'" *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 41 (1st Dep't 2014) (quoting *Foster v. Churchill*, 87 N.Y.2d 774, 751 (1996)).  To state a claim for defamation, a complaint must allege "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Id.* at 41-42.

In addition, and central to this appeal, a defamation plaintiff must allege that the purportedly defamatory statement was "of and concerning" him or her, *i.e.*, that "[t]he reading public acquainted with the parties and the subject" would recognize the plaintiff as a person to whom the statement refers. *Carlucci v. Poughkeepsie Newspapers, Inc.*, 57 N.Y.2d 883, 885 (1982); *see also New York Times*

*Co. v. Sullivan*, 376 U.S. 254, 288-91 (1964). Whether a plaintiff has satisfied this requirement is typically resolved by the court at the pleading stage. *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001). "'It is not necessary that the world should understand the libel; it is sufficient if those who know the plaintiff can make out that she is the person meant.'" *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) (quoting *Fetler v. Houghton Mifflin Co.*, 364 F.2d 650, 651 (2d Cir. 1966)) (alteration omitted). "[W]here extrinsic facts are relied upon to prove such reference the party alleging defamation must show that it is reasonable to conclude that the publication refers to him or her and the extrinsic facts upon which that conclusion is based were known to those who read or heard the publication." *Chicherchia v. Cleary*, 616 N.Y.S.2d 647, 648 (2d Dep't 1994).

**C.     The Article**

On appeal, Plaintiffs argue that they have sufficiently pled that the allegedly defamatory statements in the Article were "of and concerning" them. Specifically, Plaintiffs argue, first, that they have plausibly alleged that the defamatory statements in the Article were "of and concerning" them individually, and second, that the statements were directed at all Phi Kappa Psi

members at the time of the alleged rape such that Plaintiffs can maintain a claim for small group defamation.

While it is a close call, we conclude on balance that the complaint plausibly alleged that the purportedly defamatory statements in the Article were "of and concerning" Elias and Fowler individually. At this stage of the litigation, Plaintiffs need only plead sufficient facts to make it plausible—not probable or even reasonably likely—that a reader familiar with each Plaintiff would identify him as the subject of the statements at issue. *Iqbal*, 556 U.S. at 678. With regard to the Article, Elias and Fowler, but not Hadford, have met this burden.

We further conclude that the complaint plausibly alleged that all Plaintiffs were defamed as members of Phi Kappa Psi under a theory of small group defamation.

1.    Elias

Elias alleged that the Article was "of and concerning him" individually because during the time of the purported rape, he was both a Phi Kappa Psi brother in the class of 2013 and was known to live in the bedroom at the top of the first flight of stairs in the fraternity house. Brief for Plaintiffs-Appellants at 21. As discussed in the Factual Background, *supra*, the alleged rape took place on

the second floor of the fraternity house; the complaint alleged that Elias's bedroom was one of only three in the Phi Kappa Psi house on the second floor that could fit ten people (the number involved in the alleged gang rape) and was the only bedroom on the second floor accessible by way of the staircase without having to pass through an electronic keypad lock. The complaint also alleged that upon release of the Article, family, friends, acquaintances, coworkers, and reporters easily identified Plaintiff Elias as one of the alleged attackers and, among other things, interrogated him, humiliated him, and scolded him.

The decision below found these facts insufficient to plausibly allege that the Article was "of and concerning" Elias. Drawing all inferences in Plaintiffs' favor, we disagree.

The District Court based its determination on two observations: first, that there were several bedrooms on the second floor and the Article contained no details distinguishing Elias's bedroom from the others; and second, that the Article did not mention the presence or absence of a keypad lock. Drawing all reasonable inferences in Plaintiffs' favor, however, the absence of any mention of a keypad lock is properly construed to support the inference that Drew and Jackie did not encounter such a lock between the stairs and the bedroom.

Considering that Elias was a member of Phi Kappa Psi; he graduated in 2013 (the year that the alleged perpetrators graduated); he lived in the fraternity house in the only bedroom on the second floor that was both large enough to fit the description of the alleged location of the rape and easily accessible by non-residents; and he was in fact identified by others as one of the alleged attackers, Elias has sufficiently pled that the Article was "of and concerning" him. At this stage of the proceedings, Elias has shown that it is plausible that a reader who knew Elias could identify him based on the allegedly defamatory statements in the Article.

2.    Fowler

Fowler alleged that the Article was "of and concerning him" individually because during the time of the purported rape, he was a Phi Kappa Psi brother in the class of 2013, he had a prominent role in initiating new fraternity members, and he regularly swam at the UVA aquatic center. Brief for Plaintiffs-Appellants at 22-23. As discussed above, Fowler was the rush chair for Phi Kappa Psi in the 2010-2011 academic year and was active in the rush process during the 2011-2012 academic year. And as Erdely's Podcast gloss corroborates, the Article described a kind of fraternity initiation ritual, with the alleged attackers egging on one

unaroused participant by stating: "Don't you want to be a brother?" and "We all had to do it, so you do, too." JA-101. The Article also stated that "Drew" worked as a lifeguard and Jackie ran into Drew at the UVA pool.

We conclude that based on these facts, Fowler like Elias has plausibly alleged that the Article was "of and concerning" him. Fowler was a member of Phi Kappa Psi who graduated in 2013. And although Fowler was not a lifeguard, he visited the UVA pool regularly, where Jackie was reported to have met Drew and encountered Drew on multiple occasions. In addition, as Fowler argues, the alleged statements by the attackers, "Don't you want to be a brother?" and "We all had to do it," can plausibly be interpreted to suggest that Jackie's gang rape was related to the fraternity's initiation process, in which Fowler had a prominent role.[5] The District Court rejected this interpretation, explaining that the statements "are plausibly read as a boast—a type of perverse puffery." Again, however, such statements are to be read in the light most favorable to Plaintiffs and the relevant determination is whether Fowler's proffered

---

[5] As discussed further below, these statements cannot plausibly be read, however, to suggest that all Phi Kappa Psi members were required to engage in rape as part of the fraternity's initiation process.

19

interpretation is plausible, not whether other plausible interpretations exist.[6]

Like Elias, Fowler was also actually identified after the Article was published as one of the participants in the alleged gang rape and received harassing texts, emails, and comments from peers, co-workers, and reporters.

In short, Fowler has plausibly pled that the Article was "of and concerning" him.[7]

3. Hadford

The District Court determined that Hadford failed to plausibly allege that the Article was "of and concerning" him. Hadford's defamation claim rests primarily on the fact that, in addition to being a Phi Kappa Psi member who graduated in 2013, he rode his bike through campus regularly for fifteen months

---

[6] While Fowler did not allege that he participated in the rush process in the fall of 2012, when the purported rape occurred, he did allege that he had been active in the rush process in the two previous academic years. Given the prominence of his role in the process and the temporal proximity of his involvement to the purported rape, it is plausible that some readers of the Article concluded that he was involved. *See Springer v. Viking Press*, 457 N.Y.S.2d 246, 248-49 (1st Dep't 1982), *aff'd*, 60 N.Y.2d 916 (1983) (stating that when determining whether a fictitious work is defamatory a court "search[es] for similarities and dissimilarities").

[7] Neither party has raised on appeal, nor does it appear to have been briefed below, whether "Drew" can ultimately be "of and concerning" both Plaintiffs Elias and Fowler. Though this may be a relevant question, we leave it to be addressed in the first instance by the parties and District Court in the course of discovery, at the summary judgment stage, or at trial.

after graduating. *See* Brief for Plaintiffs-Appellants at 22. Like the District Court, we conclude that Hadford's allegations are too speculative to withstand Defendants' motion to dismiss.

According to the Article, Dean Eramo told Jackie in late-2014 that "all the boys involved [in the rape] have graduated," indicating that the attackers graduated in either 2013 or 2014. JA-108. The Article further states that Jackie was "mystified" by this because she had "just seen one of the boys riding his bike on the grounds." *Id.* Hadford argues that because he "lived on campus after graduating and rode his bike around campus," "[r]eaders aware of those facts would reasonably conclude that Hadford must have been the person who Jackie saw riding his bike on campus." Brief for Plaintiffs-Appellants at 22.

While Hadford's interpretation is possible, we conclude that he has not pled sufficient facts to render it plausible that the Article was "of and concerning" him individually. For example, there is no allegation that it is unusual for UVA alumni to bike through campus such that a reasonable reader familiar with Hadford's biking habits would conclude that the Article plausibly referred to him. The facts alleged with regard to Hadford are "'merely consistent

21

with' . . . defendant's liability," and are thus insufficient to survive Defendants' motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

4. <u>Small Group Defamation</u>

Plaintiffs argue that regardless of whether they have sufficiently alleged that the Article was "of and concerning" them individually, the Article defamed a small group to which each Plaintiff belongs: "all then-members of Phi Kappa Psi at UVA." Brief for Plaintiffs-Appellants at 15. The District Court rejected this argument, finding that neither the Article nor the Podcast expressly or impliedly stated that all fraternity members committed rape as a condition of initiation or knew that others had committed such a crime. We disagree. Because a reader of the Article could plausibly conclude that each member of Phi Kappa Psi was implicated either directly or indirectly in the alleged rapes, Plaintiffs can proceed under a theory of small group defamation.

Under the group libel doctrine, typically "a statement made about an organization is not understood to refer to any of its individual members unless that person is distinguished from other members of the group." *Three Amigos SJL Rest., Inc. v. CBS News Inc.*, 15 N.Y.S.3d 36, 41 (1st Dep't 2015), *aff'd*, 28 N.Y.3d 82 (2016). But where a statement defames all members of a small group, the

"reference to the individual plaintiff reasonably follows from the statement." *Brady v. Ottaway Newspapers, Inc.*, 445 N.Y.S.2d 786, 790 (2d Dep't 1981). Accordingly, "an individual belonging to a small group may maintain an action for individual injury resulting from a defamatory comment about the group, by showing that he is a member of the group." *Id.*; *see also Algarin v. Town of Wallkill*, 421 F.3d 137, 139 (2d Cir. 2005); *Ball v. Taylor*, 416 F.3d 915 (8th Cir. 2005) (per curiam) (finding small group exception applied where statement defamed approximately one-hundred individuals); 1 Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 2:9.4, at 2-163-64 (5th ed. 2017) (discussing *Brady* decision).[8]

To evaluate a small group defamation claim, a court considers the size of the group, whether the statement impugns the character of all or only some of

---

[8] In his partial dissent, Judge Lohier notes that he proposed certification of the issue of small group defamation to the New York Court of Appeals. Whatever the merits of certification, we must bear in mind that the process is prolonged and costly to impecunious plaintiffs. As such, we should be especially reluctant to burden litigants and courts with the process where, as here, state precedent is adequate to resolve an issue. *See, e.g.*, *Cornejo v. Bell*, 592 F.3d 121, 130 (2d Cir. 2010) ("[W]e are bound to apply the law as interpreted by New York's intermediate appellate courts unless we find persuasive evidence that the New York Court of Appeals would reach a different conclusion.") (internal alterations and quotation marks omitted)); *Commissioner v. Bosch's Estate*, 387 U.S. 456, 465 (1967) (stating that "an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise" (internal quotation marks and alteration omitted)).

the group's members, and "the prominence of the group and its individual members" in the community. *Brady*, 445 N.Y.S.2d at 794-95; *Algarin*, 421 F.3d at 139-40. Weighing these factors, we find that Plaintiffs have pled sufficient facts to establish a *prima facie* case that the Article contained defamatory statements "of and concerning" all members of the UVA chapter of Phi Kappa Psi at the time the Article was published.

As an initial matter, the size of the Phi Kappa Psi fraternity at the time of Jackie's alleged rape does not present an obstacle to small group defamation liability. "The New York Courts have not set a particular group number above which defamation of a group member is not possible." *Anyanwu v. Columbia Broad. Sys., Inc.*, 887 F. Supp. 690, 693 (S.D.N.Y. 1995). While successful small group defamation claims typically involve groups with twenty-five or fewer members, *see* Restatement (Second) of Torts § 564A cmt. b (1977), New York courts have allowed small group defamation claims to go forward where plaintiffs "numbered at least 53," *Brady*, 445 N.Y.S.2d at 788. Plaintiffs here allege that there were fifty-three members of Phi Kappa Psi at the time of Jackie's alleged rape. We thus agree with the District Court that Phi Kappa Psi is

24

sufficiently small that its members can plausibly claim that the Article's statements defamed each individual member.

However, we disagree with the District Court's conclusion that the Article did "not expressly or impliedly state that the fraternity required all initiates to participate in a rape, or impute any knowledge of such a requirement to plaintiffs." The District Court erred by evaluating the Article's various allegations against Phi Kappa Psi in isolation, rather than considering them in the context of the Article as a whole. *See Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380 (1995) ("[T]he court must give the disputed language a fair reading in the context of the publication as a whole."); *Herbert v. Lando*, 781 F.2d 298, 307 (2d Cir. 1986) (noting defamation by implication can occur where "[a] combination of individual statements which in themselves may not be defamatory might lead the reader to draw an inference that is damaging to the plaintiff"). Taking the allegations in the Article together, a reader could plausibly conclude that many or all fraternity members participated in alleged gang rape as an initiation ritual and all members knowingly turned a blind eye to

the brutal crimes. Indeed, Erdely suggested such an interpretation in her Podcast interview.[9]

Consider first the description of Jackie's purported rape. Not only did *nine* men associated with the fraternity participate in the alleged offense, but several made comments—"Don't you want to be a brother" and "We all had to do it, so you do, too"—implying the event was part of an initiation ritual.

Other allegations supported that implication. For example, the Article stated that two other female students reported to Jackie that they had been gang-raped at the fraternity, suggesting that gang rapes regularly occurred at Phi Kappa Psi. Moreover, the Article described a decades-long "trail" of sexual violence leading back to the fraternity, including a gang rape committed there in 1984. Connecting the dots, a reader could plausibly conclude that Phi Kappa Psi had a long tradition of requiring pledges to participate in gang rapes as a condition of membership.[10]

---

[9] As discussed below, we find that Erdely's Podcast statements were themselves non-actionable opinion. Nevertheless, they show that the Article can reasonably be read as describing a fraternity in which many members committed gang rapes and all members were aware of the crimes.

[10] Judge Lohier, in his partial dissent, makes no mention of these other allegations of gang rape at Phi Kappa Psi, and instead focuses exclusively on the purported statements made during Jackie's alleged rape. To the extent that Judge Lohier believes

A reader of the Article could also plausibly conclude that, even if all members of Phi Kappa Psi did not commit gang rape, they all knew that their fraternity brothers had. Erdely raised this possibility in the Podcast: "[I]t's a life where . . . people are living their lives very closely with one another. . . . [I]t seems impossible to imagine that people didn't know about this." *Cf. Brady*, 445 N.Y.S.2d at 787 (finding small group defamation where newspaper opined that "'[i]t is inconceivable to us that so much misconduct could have taken place without the guilty knowledge of the unindicted members of the department'").[11] Because the Article plausibly implied that all fraternity brothers knew about the alleged rapes, Plaintiffs sufficiently alleged that they were defamed because they were members of the fraternity at the relevant time.

---

that those statements, taken alone, are insufficient to support a theory of small group defamation, we agree. But "the court must give the disputed language a fair reading in the context of the publication as a whole." *Armstrong*, 85 N.Y.2d at 380. Here, that involves reading the statements in the context of the Article's other allegations of gang rape at Phi Kappa Psi.

[11] Judge Lohier ignores the nature of the crimes alleged in the Article when he asserts that, under our decision, "individuals who live or work in close proximity may be defamed with 'guilty knowledge' whenever one in their midst is falsely accused of misconduct." Partial Dissent at 5-6. It bears repeating: the Article alleged that no fewer than three *gang rapes* occurred at Phi Kappa Psi at or around the time Jackie was a student. Gang rape is not only a heinous crime, it is a heinous crime committed by multiple assailants. Given the gravity and number of individuals allegedly involved in the offenses, it would indeed be "impossible to imagine" that people did not know about them had they actually occurred.

27

Finally, we conclude that the size of the university community and the prominence of Phi Kappa Psi on campus support Plaintiffs' theory of small group defamation. Under New York law, a plaintiff is more likely to succeed under a theory of small group defamation in small communities where individual members are readily associated with the defamed group. *See Brady*, 445 N.Y.S.2d at 795. University campuses are often intimate communities "'where people know each other,'" *id.*, and Plaintiffs all alleged numerous instances in which they were identified and harassed on account of their membership in Phi Kappa Psi. As such, the prominence of Phi Kappa Psi on the UVA campus also supports allowing Plaintiffs to proceed under a theory of small group defamation.

In short, we conclude that Plaintiffs have plausibly alleged that the Article was "of and concerning" them under a theory of small group defamation.[12]

---

[12] Because we conclude that Plaintiffs can proceed under a theory of small group defamation based on their membership in the UVA chapter of Phi Kappa Psi, we do not reach their alternative argument that they were subject to small group defamation as members who graduated in 2013 by Dean Eramo's statement that "all the boys involved have graduated."

**D.    The Podcast**

Plaintiffs also appeal the District Court's dismissal of their defamation claim based on the Podcast.  Specifically, Plaintiffs focus on two statements in the Podcast that they assert were defamatory: Erdely's statement that the Article "seem[ed] to indicate that [Jackie's rape] is some kind of initiation ritual" and Erdely's statement that "it seems impossible to imagine that people didn't know about this . . . ."  Brief for Plaintiffs-Appellants at 15.  We agree with the District Court that these comments were entirely speculative and thus non-actionable Accordingly, Plaintiffs' claim based on the Podcast was appropriately dismissed.

"Under New York law, (with some exceptions) statements that do not purport to convey *facts* about the plaintiff, but rather express certain kinds of *opinions* of the speaker, do not constitute defamation."  *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 202 (2d Cir. 2015) (emphases in original); *see also Gross v. New York Times Co.*, 82 N.Y.2d 146, 152-54 (1996).  In discerning whether a statement is actionable under New York law, the Court considers a non-exclusive list of factors that includes: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the

29

full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal [to] . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." *Gross*, 82 N.Y.2d at 153 (internal quotation marks omitted) (ellipsis in original). In conducting its analysis, the Court "recognize[s] and utilizes[s] the important distinction between a statement of opinion that implies a basis in facts which are not disclosed to the reader or listener and a statement of opinion that is accompanied by a recitation of the facts on which it is based or one that does not imply the existence of undisclosed underlying facts." *Id.* (internal citations omitted); *see also Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 178 (2d Cir. 2000).

Although Erdely's Podcast statements related to matters that could be proven or disproven, her remarks were readily identifiable as speculation and hypothesis. For example, when discussing whether other fraternity members knew about Jackie's purported rape, she began by saying, "I would speculate that . . ." and later stated "it seems impossible to imagine . . . ." JA-26. It is true that a statement of fact will not be transformed into a statement of opinion solely by use of language expressing uncertainty or qualification. *See Gross*, 82 N.Y.2d

at 154. Here, however, the Podcast statements clearly represent Erdely's interpretation of the Article based on the words in the Article and general knowledge about what it was "probably" like to live in a fraternity house; the statements do not imply that Erdely's view is based on any undisclosed facts. *See Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) ("Though some statements may be characterized as hypothesis or conjecture, they may yet be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader. On the other hand, if a statement of opinion either discloses the facts on which it is based or does not imply the existence of undisclosed facts, the opinion is not actionable." (internal citations omitted)).

**CONCLUSION**

For the aforementioned reasons, the judgment below is AFFIRMED in part insofar as the District Court dismissed Plaintiffs' claims arising from Erdely's comments in the Podcast and Plaintiff Hadford's individual claims, and REVERSED in part insofar as the District Court dismissed Plaintiffs Elias's and Fowler's individual claims and all Plaintiffs' claims under a theory of small group defamation. We **REMAND** this case for further proceedings consistent with this opinion.

LOHIER, *Circuit Judge, concurring in part and dissenting in part*:

The majority opinion now permits every Phi Kappa Psi fraternity member to hold Rolling Stone liable under New York defamation law for publishing an article even though it is a "close call" that the only members arguably referenced in the article have a claim. Until this error is corrected by the New York Court of Appeals, publishers should beware.

Before explaining the error in greater detail, let me start with the many areas where I agree with the majority. While it is a close call, I am persuaded by and concur in the majority's opinion insofar as it concludes that fraternity members Elias and Fowler plausibly alleged that the Rolling Stone article reasonably could be interpreted to be "of and concerning" them. I also agree that we should affirm the District Court's dismissal of Hadford's primary defamation claim even though, as the majority points out, the plausibility threshold is exceedingly low. See Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 184–85 (2d Cir. 2012). As to all three plaintiffs, the "of and concerning" standard that ultimately compels these varying results is well established in New York law, long familiar to our Court, and relatively cleanly applied in this case.

Unfortunately, I have to part ways with the majority on whether the allegations in this case also support the plaintiffs' claims of small group defamation as a matter of New York law. It is not at all clear that these claims can survive even under our lenient plausibility standard.

New York State courts have on occasion recognized what has variously been called the small group libel or group defamation doctrine. See Three Amigos SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82, 87 (2016); see also 1 Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 2:9.4, at 2-158–66 (5th ed. 2017). Only one appellate court, decades ago in Brady v. Ottaway Newspapers, Inc., 445 N.Y.S.2d 786 (2d Dep't 1981), has tried to define how we might evaluate such a claim. In doing so, the Appellate Division recognized that the facts in that case landed on the outer edges of the doctrine and suggested not factors so much as a broad framework to explain the doctrine. But however the doctrine is defined under New York law, here the alleged facts and claimed defamatory statement fall even further afield, for reasons to which I now turn.

First, as we have previously explained in affirming the dismissal of a complaint premised on the small group defamation doctrine, "[t]he claim that

2

the Appellate Division allowed in <u>Brady</u> concerned a statement made against <u>all</u> members of the group." <u>Algarin v. Town of Wallkill</u>, 421 F.3d 137, 140 (2d Cir. 2005). Here, whatever the <u>Rolling Stone</u> article may imply, the complaint fails to allege that the article itself refers to <u>all</u> of the fraternity members as complicit either in committing gang rapes or in the knowledge that they routinely occurred. Instead, the complaint relies on reading the article in conjunction with Erdely's interview, which, according to the majority, "show[s] that the Article can reasonably be read as describing a fraternity in which many members committed gang rapes and all members were aware of the crimes." Majority Op. at 26 n.9; <u>see also</u> <u>id.</u> at 27–28. To the extent that the article implicates "some" or even "many" rather than "all" of the members as rapists, we suggested in <u>Algarin</u> that it is not actionable under the small group defamation doctrine. <u>See</u> 421 F.3d at 140. And to the extent that the article remotely suggests that "all" of the members knew of one or more rapes, Erdely herself indicated that this interpretation is unreasonable, correcting her suggestion that all of the brothers had guilty knowledge by admitting "maybe not everybody" would have known of a rape, given that Phi Kappa Psi is a "fairly large fraternity." Joint App'x 26.

3

Second, even if Brady's standard clearly applied to this case, I am not persuaded by the majority opinion's references to university campuses as "intimate communities" and Phi Kappa Psi as sufficiently prominent "on the UVA campus" to support the plaintiffs' theory. Majority Op. at 28. While I agree that universities can be "intimate," it is not at all clear that the New York Court of Appeals would accept the analogy between police officers in a small town and fraternity brothers on a university campus. Nor am I convinced that the Court of Appeals would adopt the factors set forth in Brady (whether the plaintiffs are part of an intimate community and are "prominent" within that community, among others) as part of the "intensity of suspicion" test that Brady employs, rather than some other factors (or even an altogether new test) yet to be devised. 445 N.Y.S.2d at 792–95.

For that reason, I proposed to my colleagues that we certify the question of small group defamation to the New York Court of Appeals, rather than rely on one New York Appellate Division case (even one cited by the Court of Appeals for another reason, see Three Amigos, 28 N.Y.3d at 87). This is an important area of New York policy that we have previously acknowledged "presents 'thorny questions.'" Algarin, 421 F.3d at 139

4

(quoting 1 Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 2.9.4.1, at 2-134 (3d ed. 2005)).  Even with the benefit of Brady, we have observed that it is unclear how "rigorous or lenient the standards might be for permitting a member of a group to complain about defamatory statements directed at the group."  Id. at 140.  Under similar circumstances, where there are virtually no State appellate decisions on an issue, or where the decisions that exist are distinguishable in a relevant and important way, and where we have no precedent of our own, we have certified the question.  See, e.g., Doe v. Guthrie Clinic, Ltd., 710 F.3d 492, 497–98 (2d Cir. 2013).  Here, though, the majority opinion not only relies on a distinguishable case,[1] but extends the doctrine by holding that individuals who live or work in close proximity may be defamed with "guilty knowledge" whenever one in their

---

[1] In Brady, twenty-seven Newburgh City police officers brought a libel action against a newspaper that printed an editorial about the reorganization of the city's police department.  See 445 N.Y.S.2d at 787.  The editorial discussed past accusations of criminal activity levied against other members of the police department, and then added the following:  "[T]he entire department was under a cloud.  It is inconceivable to us that so much misconduct could have taken place without the guilty knowledge of the unindicted members of the department.  If so, they all were accessories after the fact, if not before and during."  Id. (emphasis added).  The plaintiffs were among the fifty-three police officers who were not charged with any criminal activity.  Id. at 788.

5

midst is falsely accused of misconduct.  Majority Op. at 27.  Whether New York defamation law protects them is a policy issue for the New York State courts or legislature to decide, not us.

In refusing to certify the question, my colleagues in the majority cite to Cornejo v. Bell, 592 F.3d 121 (2d Cir. 2010), which, they say, obliges us to apply the law as interpreted by a single New York intermediate court. Cornejo does no such thing.  First, in contrast to this case, the factual situation in Cornejo was "comparable to" the situation in the single Appellate Division case on which it relied.  592 F.3d at 130.  Second, the majority's central reason for not certifying ultimately traces back to our decision in Pahuta v. Massey-Ferguson, Inc., 170 F.3d 125 (2d Cir. 1999), which we cited in Cornejo.  In declining to certify the State law question in Pahuta, however, we pointed to the existence of multiple relevant New York intermediate court decisions—not, as here, one inapposite case.  Recognizing Cornejo for the thin reed that it is, my colleagues, in an amended opinion, now also cite to the Supreme Court's decision in Commissioner v. Estate of Bosch, 387 U.S. 456 (1967), as additional support for their refusal to certify.  Their citation to this decision, which was issued decades before our certification procedures with the New

6

York Court of Appeals were established, leaves me scratching my head. In that case, the Supreme Court acknowledged that a federal court "may not be bound even by an intermediate state appellate court ruling." Bosch, 387 U.S. at 465. Seven years after Bosch, moreover, the Supreme Court touted certification, then in its infancy, as a procedure that, "in the long run, save[s] time, energy, and resources and helps build a cooperative judicial federalism." Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974). For these reasons, we should have sought guidance from the New York Court of Appeals.

Without the ability to certify, I would hold that the District Court properly dismissed the small group defamation claim. To explain, let me return to the specific allegations and claim actually made in this case. Relying primarily on two statements from the article—"Don't you want to be a brother" and "We all had to do it, so you do, too"—the plaintiffs claim that the article alleged that gang rape was an initiation ritual or a condition of membership in Phi Kappa Psi, and that all members had "guilty knowledge"

of the specific alleged rape described in the article.[2]  Therefore, the plaintiffs claim, all the men who were Phi Kappa Psi members at the time the rape purportedly occurred were defamed.  The majority accepts this claim.  As the District Court explained, however, the plaintiffs read too much into these words and rely on an interpretation that is untenable (and yes, implausible) when the statements are examined in the context of the article.  Under New York law it is well established that "innuendo . . . may not enlarge upon the meaning of words so as to convey a meaning that is not expressed."  Tracy v. Newsday, Inc., 5 N.Y.2d 134, 136 (1959).  Words "cannot be made [defamatory] by a strained or artificial construction."  Golub v. Enquirer/Star Grp., 89 N.Y.2d 1074, 1076 (1997) (quotation marks omitted).  Here, the

---

[2] The complaint in this case also alleges that the article referred to two other female students who asserted that they were "Phi Kappa Psi gang-rape victims" around the time of the alleged rape that is the main focus of the article.  Joint App'x 25–26, 50.  Even these additional statements alleged in the complaint fall short of supporting a claim of small group defamation.  The majority suggests that I ignore the article's additional description of a "decades-long 'trail' of sexual violence leading back to the fraternity, including a gang rape committed there in 1984."  Majority Op. at 26 & n.10.  But in assessing the plaintiffs' small group defamation claim, I, unlike the majority, rely on the actual allegations and limited claims in their complaint, which point only to the article's references to the three recent rapes, not a long "trail" of past rapes.

plaintiffs' proffered interpretation is entirely unsupported by either the plain text of the statements or the text read in the context of the article as a whole. Though the article discussed issues of sexual assault on college campuses generally (including at the University of Virginia and Phi Kappa Psi), it focused largely on one specific alleged rape. Interpreting the article to mean that <u>all</u> members of the fraternity were either aware of or committed acts of rape warps the language beyond its plausible meaning and surrounding context.

I therefore concur in part and respectfully dissent in part.